UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ERIC AMIDON; WINSTON BROWNLOW; and
COLLEGIAN ACTION LEADERSHIP LEAGUE
OF NEW YORK, by its President,

                         Plaintiffs,

       vs

STUDENT ASSOCIATION OF THE STATE
UNIVERSITY OF NEW YORK AT ALBANY;
PRESIDENT OF THE STUDENT ASSOCIATION
OF THE STATE UNIVERSITY OF NEW YORK
AT ALBANY, in his Official Capacity; and NEW
YORK PUBLIC INTEREST RESEARCH
GROUP "NYPIRG,"

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**U. S. DISTRICT COURT
N. D. OF N. Y.
FILED**

**NOV   7 2005**

AT _____ O'CLOCK ____M
LAWRENCE K. BAERMAN, Clerk
UTICA

1:04-CV-256

APPEARANCES:

THOMAS MARCELLE, ESQ.
Attorney for Plaintiffs
2 E-Comm Square, Third Floor
Albany, New York 12207

LEWIS B. OLIVER, JR., ESQ.
Attorney for Defendants Student
   Association of the State University
   of New York at Albany and President
   of the Student Association of the State
   University of New York at Albany
156 Madison Avenue
Albany, New York 12202

FRIED FRANK HARRIS SHRIVER
   & JACOBSON, LLP
Attorneys for "NYPIRG"
24th Floor
One New York Plaza
New York, New York 10004-1901

DAVID N. HURD
United States District Judge

OF COUNSEL:

DARCY M. GODDARD, ESQ.
JOHN A. BOREK, ESQ.

ABBREVIATIONS USED THROUGHOUT:

CALL-NY - Collegian Action Leadership League of New York
CFACT - Collegians for a Constructive Tomorrow
NYPIRG - New York Public Interest Research Group, Inc.
RSO - recognized student organizations
SA - Student Association of SUNY Albany
SUNY - State University of New York

## MEMORANDUM DECISION and ORDER

## I. INTRODUCTION

Plaintiffs are two State University of New York ("SUNY") at Albany students, Eric Amidon ("Amidon") and Winston Brownlow ("Brownlow"), and a student organization to which they belong, formerly Collegian Action Leadership League of New York ("CALL-NY"), now called Collegians for a Constructive Tomorrow ("CFACT"). They bring claims pursuant to 42 U.S.C. § 1983 and § 1988 alleging that defendants, the Student Association of SUNY Albany ("SA"), and its president, distribute money collected pursuant to a mandatary student activity fee in a manner which violates their First and Fourteenth Amendment rights. New York Public Interest Research Group, Inc. ("NYPIRG"), another SUNY Albany student organization that also receives funds from the mandatory fee monies, has intervened in this action as a defendant.

Plaintiffs bring five causes of action. Under the First cause of action, plaintiffs seek to prohibit the defendants from using advisory referenda in allocating the money collected from the mandatory fees.[1] In the Second, Third, and Fifth causes of actions, plaintiffs

---

[1] Since the filing of the complaint, the relevant SUNY regulation and student government constitution and bylaws have been amended. Accordingly, the arguments of the parties, and to some extent the relief sought, has evolved in response. The First cause of action complains that referendums are used to permit funding and defunding of student groups. (Compl. ¶ 55.) However, due to the amendments just noted, the
(continued...)

challenge the defendants' procedures for gaining access to the referendum.  In the <u>Fourth</u> cause of action, plaintiffs challenge NYPIRG's funding arrangement with the student government.  Plaintiffs filed a motion for summary judgment, defendants opposed and filed cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56, which the plaintiffs opposed.  Oral argument was heard in Albany, New York on July 22, 2005.  Decision was reserved.

## II.  FACTS

The legal context for understanding the events of the instant case was articulated in the Supreme Court's decision in <u>Board of Regents  v. Southworth</u>, 529 U.S. 217, 229 (2000). The <u>Southworth</u> plaintiffs brought suit concerning the constitutionality of mandatory student activity fees.  Plaintiffs complained that the combination of the mandatory fee and its use to fund extracurricular, political, and ideological speech, with which plaintiffs disagreed, violated their First Amendment rights.

The Court recognized both the university's and society's interest in "facilitating the free and open exchange of ideas by, and among, its students," and upheld the fee.  <u>Id</u>. at 229.  However, it acknowledged that plaintiffs' First Amendment rights were implicated and held that the fee passed constitutional muster only if the university provided some protection of those rights.  That protection consists of  "the requirement of viewpoint neutrality in the allocation of funding support."  <u>Id</u>. at 233.  The court explained that "[v]iewpoint neutrality is

---

[1](...continued)
focus of the arguments has not been about whether referendums are permissible considerations for deciding whether to fund or not, but whether they can used to determine the <u>amount</u> of funding.  The complaint will be treated accordingly.

the justification for requiring the student to pay the fee in the first instance and for ensuring the integrity of the program's operation once the funds have been collected." Id.

Like the university in the Southworth case, SUNY Albany collects a mandatory student activity fee.  The fee has been $80.00 per semester during the course of events of this case.  SUNY collects the fee from the students and then turns the funds over to the SA. Plaintiffs Amidon and Brownlow enrolled at SUNY Albany in the fall of 2001 and paid the mandatory fee each semester thereafter.

The funds are allocated to recognized student organizations ("RSO"), by the SA, pursuant to a regulation of the Board of Trustees of SUNY at N.Y. COMP. CODES R. & REG. tit. 8, § 302.14.  The regulation provides that the amount of the student activity fee is "fixed and assessed by the student government" in consultation with the university chancellor.  N.Y. COMP. CODES R. & REG. tit. 8, § 302.14(c)(2) (2005).  Every two years, the student body determines by referendum whether the fees shall be mandatory or voluntary.[2] Id. § 302.14 (a).  The mandatory nature of the activity fee at SUNY Albany is regularly approved by student referendum.  The collection of the fee generates about $1.69 million annually. (Docket No. 4, Def. Ans. ¶ 22.)  Non-payment of the fee results in withholding of a student's transcript or refusal to allow the student to register for classes.  N.Y. COMP. CODES R. & REG. tit. 8, § 302.14(c)(2)(2005).

The funds allocated to each of the more than 100 RSOs at SUNY Albany are listed as budget lines on a general budget presented by the Budget Committee to the legislative branch of the student government.  (Docket No. 25, Def. SA's Statement of Material Facts

---

[2] This is a separate referendum.  It is not to be confused with the referendum (at issue in this case) that effects allocation of the fees.

("DSMF") ¶ 16.)  That branch - now called the Senate, formerly called the Central Council - approves, disapproves, or modifies the budget, and then sends it to the SA president for approval or veto.  Id. at ¶ ¶18, 19.  Finally, the budget is submitted to the president of the university for approval, which generally consists of ensuring that the use of the fees complies with N.Y. COMP. CODES R. & REG. tit. 8, § 302.14.  Id. at ¶ 26.  In recent history, the president has regularly approved the budget.  Id. at 28.   While funding is generally done annually, RSOs may request additional funding as needed. (Docket No. 32, Pls.' Statement of Material Facts ("PSMF") ¶ 17.)

New and previously unfunded RSOs apply for funding by submitting a budget request to the Finance Committee of the SA.  Id. at ¶ 14.  The Finance Committee makes a recommendation on the budget to the SA Senate.  Id. at ¶15.  If the RSO has been previously funded it presents a budget directly to the Senate.  Id.  The more than 100 RSOs at SUNY Albany vary in both subject matter and funding, examples include the Debate Club ($500),  University Dance Council ($4,000), Theatre Council ($2,350), and Fuerza Latina ($30,880). (Docket No. 32, De Leeuw Aff. Ex.8)

Two RSOs at SUNY Albany receive relatively constant funding pursuant to contracts with the SA: defendant NYPIRG and Dippikill, Inc. [3]  (Docket No. 32, Weber Aff. Ex. 1.)  Section 816.4 of the SA Constitution provides that "all designated funds (including but not limited to Dippikill and NYPIRG), in the Student Association Budget are to be brought

---

[3] Dippikill is an not-for-profit corporation which owns an eight hundred sixty-one acre property located in Warren County.  The property is used for conferences, nature meetings, athletic events, biology field trips and agricultural experiments.  The rationale behind the four-year referendum cycle is to provide stability and continuity for the corporate business.  Dippikill is allocated over $210,000 from the collected activity fees.

up in a referendum at least every four years." (De Leeuw Aff. Ex. 4.)  Thus, NYPIRG automatically appears on the ballot every four years.  (Weber Aff. Ex 1 NYPIRG Contract ¶ 1.)  Plaintiff characterizes this as an automatic right or privilege because other groups must meet separate requirements to be placed on the referendum.  Defendants assert that the NYPIRG referendum is just an advisory referendum, and is used to gauge student interest in the campus-related services that NYPIRG performs.  The question of continued funding for NYPIRG passed the referendum votes in 1999 and 2003.  SA allocates $5.00 out of the $80.00 student fee to NYPIRG, which totals around $106,000 annually.

Plaintiffs characterize NYPIRG as a politically liberal organization.  According to Rebecca Weber, the Executive Director of NYPIRG, the group is a non-profit, nonpartisan organization directed by SUNY and its students with twenty-one local chapters across the state.  (Weber Aff. ¶¶ 3, 4.)  Part of NYPIRG's mission is to train students in civic engagement and advocacy through hands-on experience.  Id. at ¶ 5.  Its services include: campus and legislative internships, voter registration campaigns, homeless awareness and service campaigns, book-exchanges, conducting surveys on public issues, lobbying the state legislature, and workshops on public speaking, media outreach, and consumer issues.  Id. at ¶ 7.  By contract, NYPIRG is obligated to run its projects independently by providing its own staff, student supervision, and an on-campus office.  It must also consult with SUNY, allow a SUNY representative on its Board of Directors, follow SA Constitutional policy, and meet stringent financial reporting requirements.  Id. at ¶ 11.

Because SUNY's fee policy was developed in the 1970s, in June of 2001, SUNY Chancellor Robert King formed a task force to review the Board of Trustees policies regarding mandatory student activity fees with respect to current law and fiscal accountability.

- 6 -

(De Leeuw Aff. Ex. 3, Task Force Report at 2.)  The report was issued in January of 2002.

(The recommendations are reflected in amendments to N.Y. COMP. CODES R. & REG. tit. 8, §

302.14 effective September of 2004.)  Recommendation 8 of the report provides that:

> representative student organizations allocating student activity fees to
> student organizations must comply with the principle of viewpoint
> neutrality.  In other words, allocations must not depend on the views held
> by the organization but must be related to established criteria that have
> nothing to do with the political or ideological views held by the
> organization and its members.

Id. at pp. 8-9.  It further recommends that student organizations should specify the neutral

criteria that govern allocation decisions.  Id. at p. 9.  The report provides that "the allocations

may recognize the differences in numbers of student participants and quality and quantity of

programs," and lists five other examples of criteria for consideration:

1. The organization has a constitution.
2. There is a written plan for expenditure of allocated funds.
3. The past record of the organization in fully utilizing its allocation.
4. The number of students served by the funded activities of the organization.
5. The organization should be in good standing with the student government.

Id.  The Southworth case is cited as the rationale for the recommendation.

Michael Jaromin, Director of Student Affairs, testified that the SUNY Albany

administration was aware of the Southworth decision and the requirement that student

activity fee monies must be allocated in a viewpoint-neutral manner.  (Docket No 45, Jaromin

Aff. ¶ 6; McNamara Aff. ¶18.)  Though plaintiff Amidon disputes the assertion, Jaromin

claims that he made the SA leadership aware of the Southworth neutrality requirements and

provided them with copies of the decision sometime in 2002 .  (Jaromin Aff. ¶ 6.)

Plaintiffs are not the only SUNY Albany students to challenge the allocation process

of the SA.  Scott Barea ("Barea"), and other SUNY students were involved in the production

of a politically conservative paper, the <u>College Standard Magazine</u> ("CSM") in late 2002 and early 2003.  Armed with his copy and interpretation of the <u>Southworth</u> decision, Barea sought funding from the SA.  In December 2002, he threatened to take legal action if CSM was not completely funded.[4]  In February 2003, after a one hour-debate, the SA legislature voted 14 to 6 against funding CSM.  Barea filed suit in April 2003 challenging the SA Senates' allocation process, and the denial of funding for CSM.

Thus, by the spring of 2003, considering the Task Force Report, administrative notice, and a threat of legal action, SA leadership was aware of <u>Southworth</u> and its viewpoint neutrality requirement for allocation decisions, and at some point began work on an amendment to its constitution to address the issue.

Amidon, a self-proclaimed conservative, and some like-minded fellow students formed the student organization called CALL-NY, at least in part, to counter the perceived liberal voice of NYPIRG on campus.  According to Amidon, "CALL-NY is an organization that focuses on affordable and accessible higher education and environmental problems facing the world."  (PSMF ¶ 45.)  "CALL-NY believes that most consumer and environmental problems can best be met and overcome - not through excessive government regulation and bureaucracy - but by unleashing the power of the free enterprise system."  <u>Id.</u> at ¶ 46.

CALL-NY received $1200 in funding from the SA for the 2003-2004 school year, but wanted its funding to be considered on a referendum vote in the same manner as NYPIRG's. Thus, CALL-NY sought to be placed on the referendum ballot in the Spring of 2003. The procedures for getting placed on a campus-wide referendum are found in § 705 of the SA

---

[4] Plaintiff Amidon supported CSM at its beginning but later determined that CSM and Scott Barea did not represent true conservative philosophy.

Constitution.  (De Leeuw Aff. Ex. 4, SA Constitution § 705.1(b).)   To place a question on the spring referendum ballot, a RSO must either collect 15% of the signatures of the entire student body, or receive a 2/3 vote of the SA Senate.  Id. § 705.1(c).  CALL-NY attempted the latter method but did not get the requisite 2/3 vote of the SA Senators.

Plaintiffs argue that, despite notice of the Southworth requirements, the voting process was unconstitutional as it was not guided by viewpoint neutral criteria.  They argue that the SA Senate lacked a policy delineating what criteria should be used in decision making, and assert that this lack of criteria amounts to unconstitutional unbridled discretion.  This argument reflects the holding in a subsequent decision of the Seventh Circuit in the Southworth case, which held that "the prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement."  Southworth v. Bd. of Regents of the Univ. of Wis. Sys., 307 F.3d 566, 579 (7th Cir. 2002) ("Southworth II").

Defendants assert that the SA uniformly followed several unwritten policies and practices concerning the allocation of student activity fee money.  (DSMF ¶ 31.)  The SA considered: (1) number of active members - a group of more than 20 members is much more likely to get funding than one with five or less; (2) whether the organization is active on the entire campus and accessible to a wide range of students - or to a small group that may spend its allocation on a group party; (3) first time applicants generally receive $250-300 and are eligible for more after a year of experience and a track record; and (4) funding is without regard to the group's political orientation.  Id.

The decision not to place CALL-NY on the referendum was appealed to the SA Supreme Court pursuant to the SA Constitution.  While the court held that plaintiffs had not demonstrated that their rights had been violated in this particular instance, it also ruled that:

- 9 -

> Central Council does have unbridled discretion when determining which
> referendum questions will go on the ballot. . . .  They must either put
> restrictions in place to limit their discretion or eliminate the mechanism
> completely in order to prevent the viewpoint neutrality principle from being
> violated.

(Docket No. 45, McNamara Aff. Ex. A. [CALL-NY] v. University at Albany Student

Association, Case # 02-005, Decided March 31, 2003.)

 The amendments to the SA constitution were completed and in effect by August of

2003.  The Finance Policy was modified to include a Viewpoint Neutrality section at § 808.2.

(De Leeuw Aff., Ex. 4 at p. 10.)  The provision requires that funding decisions "shall be made

without considering the viewpoint or ideology expressed by the recipient of the funds."  Id.

Records are to be made of the decision making process and shall be made available to

applicants upon request.  Upon further request, a RSO shall receive written reasons for the

denial and decisions are appealable to the SA Supreme Court.  The provision does not,

however, list any specific criteria for use in making such determinations.

 In the spring of 2004, CALL-NY formalized its apparent national affiliation with

CFACT National by formally changing the name of the organization to CFACT and, again,

sought to be placed on the ballot for a referendum vote on its funding.  Amidon sponsored

the requisite bill at a SA Senate meeting on March 10, 2003 .  The question considered for

placement on the ballot read:

> Do you wish to support a chapter of the Collegian Action Leadership
> League of New York at five dollars per semester creating a viewpoint
> neutral vehicle for the avocation of affordable and accessible higher
> education, protecting the rights of all citizens, and promoting a free
> enterprise economy on campus?

(DSMF ¶ 48.)  A CFACT National representative, Bill Gillis, was present at the meeting and explained that <u>Southworth</u> required that CALL-NY[5] be treated equally to NYPIRG, and that their majoritarian standard was unconstitutional.  The SA's attorney, Lewis Oliver, was also present.  Defendants assert that he explained that the SA had discretion in making its decision as long as the decision was made on content-neutral grounds, like a track record of responsibility, and/or an outline of a sufficient program to deserve consideration in a referendum.  It was a unanimous vote against placing the question on the ballot.   CALL-NY claims that some members of the SA Senate made explicit reference to CALL-NY's capitalistic viewpoint as a reason for rejecting their application.  Allegedly, one senator voted against the group because it was pro big business.  (PSMF ¶ 54.)

As plaintiffs have challenged the decision as viewpoint based, defendants  provided a list of reasons to explain why CALL-NY was denied access to the referendum ballot: (1) senators were concerned that the recent name change denoted conflict or division in the group; (2) CFACT was new and unproven with no track record to justify just over $100,000 in funding; (3) the group's plan consisted only of bringing in speakers; (4) there was no written program or plan; (5) CALL-NY hadn't used its money from the year before; (6) CALL-NY hadn't presented programs on campus the previous year; (7) the group consisted of only 15 to 30 members; (8) the particular ballot question presented was vague and might have been misleading; (9) the group demonstrated an inconsistent attitude about referendums - the referendum process is unconstitutional, yet the group wanted one; and

---

[5]  Despite the name change, the complaint and motion papers continue to refer to CFACT as CALL-NY.  The practice is adopted here.

(10) placing the group on the ballot would set a poor precedent because more of the 100 campus RSOs might consider going the referendum route to obtain large sums of money. (DSMF ¶ 112.)

Amidon claims CALL-NY handed out a description of the organization, the constitution of the organization, proposed programs, and more.  (Amidon 2005 Aff. ¶ 47.)  He adds that CFACT fund-raised, received local, state, and national recognition for its activities, and appeared on radio shows.  He claims that the group did not apply for use of its funding because group members spent funds out of their own pockets, and it was aware that another conservative group had problems getting reimbursements.  (Amidon 2005 Aff. ¶ 80.)

At the end of the meeting, the SA President was served with the summons and complaint in the instant action.  Inter alia, plaintiffs seek an injunction prohibiting the use of referenda in the allocation process and the return of their student activity fee money.  The complaint was filed on March 9, 2004 - the day before the meeting.

Since that time, the SUNY regulation governing allocation of fees and the student bylaws have been amended.  As of September 2004, N.Y. COMP. CODES R. & REG. tit. 8, § 302.14(1)(a) provides that:

> [t]he student government shall prepare and approve a budget governing expenditures from student activity fees in accordance with the principles of equal opportunity and viewpoint neutrality. . . The constitution and bylaws of such student government shall specify the criteria governing eligibility for funding of and allocations to student organizations from student activity fees.  The student government may provide for the use of the advisory referenda of the student body with respect to particular funding decisions but may not agree to be bound by such referendum.

It also explains that funds may be used to assist RSOs, provided that:

> the criteria governing eligibility for funding of and allocations to such student organizations from student activity fees and the advisory nature of

any referenda held by the student government to aid in particular funding decisions shall be specified in the constitutions and by the bylaws of the student organization.

Accordingly, On March 2, 2005, the SA amended § 517.0 of its bylaws to include the following:

517.1  In accordance with the SUNY Board of Trustees' Guidelines, the Student Association may use advisory referendum of the student body to garner input with respect to articular funding decisions.  Provided, however, that an advisory referendum can be used only to advise the SA regarding the appropriate level of funding and not to determine whether a group will or will not be funded.

517.2  The results of such referenda may be used by the Student Association to assist in determining an appropriate level of funding for the Student Group in Question.

517.3 The Student Association Senate shall not restrict the use of referenda based in any way upon the viewpoint of any organization.

517.4  All advisory referenda are subject to a two-thirds approval vote of the entire voting membership of the student Association Senate, before such referenda may be placed on the ballot.

517. 5  When determining whether or not to use an advisory referendum to help establish a funding level for an RSO . . . or an activity, the Student association will consider criteria including but not limited to: whether the organization can demonstrate that it will expend funds for the enrichment of campus life at the University at Albany: whether the organization can provide services that compliment the educational mission of the University at Albany; whether the organization can demonstrate that it has undertaken successful events and activities in the past; whether the organization maintains a constitution or bylaws; whether the organization is directed by students; whether the organization can demonstrate sufficient student interest in its activities to warrant a particular level of funding.

517.6  The Student Association shall remain viewpoint neutral when making decisions informed by the results of a referendum.  The viewpoints of the said RSO, its members, or the viewpoints of other RSO's shall not effect the Student Association decisions.

(De Leeuw Aff. Ex. 5 SA Bylaws §§ 517.1- 517.6.)

## III. **DISCUSSION**

### A. **Summary Judgment**

Summary judgment is granted only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Silver v. City Univ. of New York, 947 F.2d 1021, 1022 (2d Cir. 1991). The court will not try issues of fact on a motion for summary judgment, but, rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). Thus, "[s]ummary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir. 1993).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." Anderson, 477

- 14 -

U.S. at 248; R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir. 1997).  The Court is "to

grant summary judgment where the nonmovant's evidence is merely colorable, conclusory,

speculative or not significantly probative."  Schwimmer v. Kaladjian, 988 F. Supp. 631, 638

(S.D.N.Y. 1997) (citing Anderson, 477 U.S. at 249-50)

### B.  § 1983 and Eleventh Amendment Immunity Defenses

Defendants claim at the outset that SA conduct does not constitute state action.

Thus they may not be held liable under § 1983 because they are not state actors.

Thereafter, defendants argue that if they are subject to such liability, then they are immune

from suit based on Eleventh Amendment immunity.  It is not necessary to delve into a

thorough analysis of either issue in the instant case as District Court Judge Thomas J.

McAvoy recently addressed, and rejected, these precise arguments in a well-reasoned

opinion in the College Standard Magazine case referred to above. [6]  (Docket No. 12, App. to

Pls.' Mem., College Standard Magazine v. State University of New York et al., 03-CV-505,

Tr. Bench Decision, James T. Foley Courthouse, Albany, New York, June 9, 2003.)

"[T]he acts of a private party are fairly attributable to the state on certain occasions

when the private party acted in concert with state actors."  Rendell-Baker v. Kohn, 457 U.S.

---

[6] College Standard Magazine v. State University of New York, et al. was filed and served in April of 2003, and the case has proceeded accordingly.  District Court Judge Thomas J. McAvoy considered the issue of whether, despite the lack of written policies in 2002, unwritten funding policies provided adequate protection of students First Amendment Rights.  Presuming that such polices were actually in existence, plaintiff brought a facial attack on the unwritten policies that bridled the discretion of the decision makers.  The court held that the alleged unwritten policies were "insufficient evidence of adequate standards to avoid the problem of unbridled discretion."  College Standard Magazine v. State University of New York, et al., 03-CV-505, Tr. Bench Decision, James T. Foley Courthouse, Albany, New York, August 8, 2005 at 5.

The court noted that N.Y. COMP. CODES R. & REG. tit. 8, § 302.14 "does not set out a mechanism for approving or disapproving funding requests or otherwise allocating funding among recognized student organization."  Id. at 6.  The criteria listed - the number of students served and the length of time the organization has been in existence - discriminated against less traditional viewpoints.  The court held that "assuming [the SA] did have such an unwritten policy, the student association's unwritten policy allows for too much discretion."  Id. at 8.   The policy was deemed facially unconstitutional.

830, 841 (1982).  On the facts of this case, the SA clearly acts in concert with the state to create a forum for the exercise of First Amendment rights.  The SA determines the amount of the fee.  The state collects it, enforces its payment, and turns it over to the SA.  The SA distributes the money pursuant to state regulation and approval.  See  N.Y. COMP. CODES R. & REG. tit. 8, § 302.14(c) (2005).  The SA is intertwined with the state in collecting, budgeting, and allocating funds to create a forum for speech, and therefore, the SA acts under the color of state law.  See Carroll v. Blinken, 42 F.3d 122, 131 (2d Cir. 1994) (finding NYPIRG to be a state actor because its conduct "was made possible by state regulations, enforced by SUNY Albany, that make payment of the entire fee a condition of registration, attendance, matriculation and graduation at SUNY Albany.").

It is long established that, per the Eleventh Amendment, federal courts lack jurisdiction over suits against non-consenting states.  Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73 (2000).  Defendants argue that if they are deemed to be state actors, they are entitled to Eleventh Amendment immunity because the SA is an arm of the state.  While SUNY has been considered an arm of the state, that characterization does not necessarily apply to the SA.  Judge McAvoy's balancing of the requisite factors to determine whether the SA is an arm of the state is adopted here.  CSM June 2003 Tr. at 11-12; see also Mancuso v. New York State Thruway Auth., 86 F.3d 289, 296 (2d Cir. 1996) (balancing factors and declining to grant immunity to the New York State Thruway Authority).  The SA is self-created and governed by its own elected representatives.  Moreover, the state is not liable for the damages sought here.  Plaintiffs seek the return of fees paid into the SA fund, and damages would be paid from that fund.

- 16 -

Defendants acted under the color of state law, and are therefore subject to liability under § 1983.  They are not entitled to Eleventh Amendment immunity from such liability because the SA may not be considered an arm of the state.

### C. § 1983 First Amendment Facial Challenge

Plaintiffs attack the allocation procedures at SUNY Albany on several grounds, but the focus of the instant action is on the defendants' use of an advisory referendum in allocating funding from the mandatory student activity fees.  Plaintiffs argue the policy is facially invalid, in that it permits student senators, who are supposed to be guided by viewpoint-neutral standards, to consider a clearly viewpoint-based, majoritarian factor.  See Forsyth County v. Nationalist Movement, 505 U.S. 123 (1992) (applying overbreadth doctrine to invalidate, on its face, an ordinance allowing for content-based discrimination in the awarding of parade permits); Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 760 (1988) ("A facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers"); see also Virginia v. Hicks, 539 U.S. 113, 118 (2003).

Defendants offer two arguments in support of the referendum.  First, they contend that the referendum process at issue has already been approved by the Second Circuit in a series of cases related to Carroll v. Blinken, 957 F.2d 991 (2d Cir. 1992).  They also argue that the referendum is not problematic because it is a content-neutral guide that is only advisory in nature.  These arguments will be addressed in turn.

- 17 -

1. **The Carroll cases**

The Carroll case concerned the initial question addressed in Southworth, whether funding speech activities by a mandatory fee constitutes unconstitutional compelled speech or the permissible fostering of a public forum for a diverse range of opinion.  Id. at 995. Deciding on the latter, the court considered the use of funds in relation to on-campus activities and an automatic membership mechanism in the fee policy whereby all students became members of NYPIRG when enrolling for classes and paying the activity fee.  Id. at 1002-03.  While the Southworth Court analyzed and justified funding groups to foster an extracurricular atmosphere under the protection of viewpoint neutrality, the Carroll court simply noted that the referendum at issue in that case, which defendants claim is comparable to the one in this case, was "content-neutral; that is, it [did] not grant or withhold funds based on the content of the recipient's speech."  Id. at 999.

This one sentence conclusion cannot be considered binding in the instant matter. The Carroll decision was issued in January of 1992, five months before the Supreme Court's decision in Forsyth County v. Nationalist Movement, which, as will be discussed below, governs the issue.  505 U.S. 123 (1992).   It also predates Southworth, in which the Supreme Court expressed concern about the use of referenda.  The Court commented that:

> [w]hile the record is not well developed on the point, it appears that by majority vote of the student body a given RSO may be funded or defunded. It is unclear to us what protection, if any, there is for viewpoint neutrality in this part of the process. To the extent the referendum substitutes majority determinations for viewpoint neutrality it would undermine the constitutional protection the program requires. The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views. Access to a public forum, for instance, does not depend upon majoritarian consent. That principle is controlling here.

Southworth, 529 U.S. at 236 (remanding for reexamination of the issue in light of the foregoing principles). It is true that the referendum at issue in this case is distinguishable. It only affects the amount of funding, not whether or not to fund at all. Nonetheless, it is believed that lack of explanation for the Carroll court's determination and the evolution in the law since that holding justify another judicial look at SUNY Albany's use of referenda in allocating money from student fees.[7]

### 2. Content-based discretionary factors

#### a. In public forum cases

Turning to the question of the use of advisory referendum in funding decisions, a brief overview of the legal landscape is required. As noted above, the Supreme Court has recognized the importance of fostering extra-curricular life on university campuses. It has explained that a university "may determine that its mission is well served if students have the means to engage in dynamic discussions of philosophical, religious, scientific, social, and political subjects in their extracurricular campus life outside the lecture hall." Southworth, 529 U.S. at 233. [8] Accordingly, SUNY Albany has created a public forum in the form of a fund to support students' free speech. "[It] is a forum more in a metaphysical than in a

---

[7] The argument has also been made that the Southworth case may be a dispositive statement against the use of referendums. Yet, over the course of many decisions in the Southworth case, neither the Supreme Court nor the Seventh Circuit decided the issue of the use of referendums in the funding allocation process. The Supreme Court expressed doubt as to the use of referenda. Southworth, 529 U.S. at 235 ("The student referendum aspect of the program for funding speech and expressive activities, however, appears to be inconsistent with the viewpoint neutrality requirement.") However, lacking sufficient information it did not make any determination of constitutionality. Id. After the Southworth decision, the university stopped using referendum, and the parties stipulated to the dismissal of the students' claim challenging the constitutionality of the referendum thereby rendering the question moot on remand. Southworth II, 307 F.3d at 570.

[8] It also noted that "[f]or the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." Rosenberger, 515 U.S.at 836.

spatial or geographic sense, but the same principles are applicable." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 830 (1995). The Supreme Court has recognized that in this particular forum, denial of funding equates to denial of access. Id. at 835 -37.

Thus created, the nature of the forum determines the government's power to regulate the speech within it. See Peck ex rel. Peck v. Baldwinsville Central School Dist., Civ. Act No. 04-CV-4950, 2005 WL 2649472, at 6 (2d Cir. Oct. 18, 2005); Lebron v. Nat'l R.R. Passenger Corp., 69 F.3d 650, 655 (2d Cir. 1995). In Southworth, the Supreme Court explained that a public university student activities fund is not a "public forum" in the traditional sense of the term,[9] but public forum cases are instructive with respect to safeguards as to the expressive activities which objecting students are required to support. Southworth, 307 F3d. at 580; Southworth, 529 U.S. at 230 ("The standard of viewpoint neutrality found in the public forum cases provides the standard we find controlling.").

Thus, similar to citizens applying to use any other public forum, "under the Supreme Court's decision in Southworth, [plaintiffs] are entitled to the protection of viewpoint neutrality. The requirement of viewpoint neutrality includes a mandate that a decision maker not possess unbridled discretion." Southworth II, 307 F.3d at 595. Public forum cases which address that "bridling" of official discretion rely on the premise set forth in Shuttlesworth v. Birmingham in the context of granting parade permits. 394 U.S. 147, 151 (1969). The

---

[9] "A traditional public forum is property, such as a public street or a park, that 'by long tradition or by government fiat ... ha[s] been devoted to assembly and debate.'" Perry v. McDonald, 280 F.3d 159, 166 (2d Cir. 2001) (quoting Perry Educ. Ass'n v. Perry Local Educ. Ass'n, 460 U.S. 37, 45 (1983)).

Shuttlesworth court explained that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." Id. at 150-51; see also Osediacz v. City of Cranston, 344 F. Supp. 2d 799, 812 (D.R.I. 2004). "Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." Thomas v. Chi. Park Dist., 534 U.S. 316, 323 (2002) (citing Forsyth County v. Nationalist Movement, 505 U.S. 123, 131 (1992)). Thus, courts require that regulations of speech in public forums contain adequate standards to guide the official's decision and render it subject to effective judicial review. Id. at 323.

The defendants argue that there are sufficient criteria in place to guide the student senators' discretion. In 2003 and 2004, those criteria were unwritten, but now they may be found in the SA bylaws. However, as the Second Circuit explained, "the existence of standards does not in itself preclude a finding of unbridled discretion." See Beal v. Stern, 184 F.3d 117, 126 (2d Cir. 1999) (citing numerous cases). Indeed, courts have invalidated decision making processes which consider impermissible factors related to the popular response of public speech. Plaintiff argues that referendums, advisory or otherwise, are impermissible considerations because they reflect the majoritarian view of a particular RSO's value.[10]

In Forsyth County v. Nationalist Movement, the Supreme Court invalidated a city ordinance which allowed city officials to set its parade fees, in part, in relation to the costs of maintaining public order at the parade. Forsyth, 505 U.S. at 137. The Court invalidated the

---

[10] There is some dispute as to whether the student referendum regarding the funding of NYPIRG was considered binding or not before the 2004 amendment to N.Y. COMP. CODES R. & REG. tit. 8, § 302.14, which clearly makes it advisory. It is not necessary to make a factual determination on the issue.

ordinance as overbroad in granting the official unbridled discretion.  The city ordinance did not provide any objective factors to guide an official's setting of the fee.  But, even more troublesome, was the fact that the official considered the predicted costs of the security required to protect the participants and observers.  Id. at 134.  The Court noted that unpopular speech would likely be more expensive than popular speech, and added that "speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob."  Id. at 134-135.   That is essentially what is at risk in this case - unpopular speech will be made more expensive than popular speech because the SA will subsidize the popular speech.  The Forsyth court concluded that a "[l]istener's reaction to speech is not a content-neutral basis for regulation."  Id. at 134; see also Rosenberger, 515 U.S. at 830-31 (noting difference between viewpoint and content discrimination and concluding that the former is a subset of the latter).

In the same vein, the Seventh Circuit recently considered the validity of a city policy banning the placement of signs and banners on a highway overpass in Madison, Wisconsin. Ovadal v. City of Madison, 416 F.3d 531 (7th Cir. 2005).  The statute at issue prohibited "conduct that tends to cause or provoke a disturbance."  Id. at 535.  As the court read it, the statute didn't apply to signs that impaired traffic safety, but rather to those that upset the public.  "[City] officers were permitted to decide on an ad hoc basis whether to allow [a] protest to continue depending on how drivers react to the signs."  Id. at 537.  There was evidence in the record that the actual problem was not that drivers were distracted by the signs, but that drivers were engaging in various acts - like angry hand gestures, and coming up through their sunroof to yell - in response to the message of the signs.  The court

- 22 -

concluded that the statute was a content-based regulation.  Id. at 538.

### b. In the student activity fee context

In the context of allocation of student activity fees, the Seventh Circuit held that the consideration of the popularity of speech is an impermissible factor for guiding discretion and invalidated considerations that provided a basis for an inference of public response to an RSO's value.[11]  Southworth, 307 F.3d at 594.  The student senators at the University of Wisconsin were allowed to consider (1) the length of time an organization had been in existence or the amount of funding the RSO received in the past, and (2) the number of students benefitting from the speech in allocating funding.  Id. at 593-95.  The court considered the criteria to be related to the RSO's speech or viewpoint, and therefore impermissible.

The court noted that the length of time and previous funding of RSOs will not always reflect popularity of speech, but in that case it did because "viewpoint discrimination from past years [had] been institutionalized into the current system."  Id. at 594.  The RSO at issue, a Wisconsin branch of PIRG, received its funding in the past "from the constitutionally deficient student referendum mechanism."  Id. at 594.  If this criterion was used, "historically popular viewpoints [would be] at an advantage compared with newer viewpoints."  Id.

The other factor, the number of students benefitting from speech, also failed to the extent it that reflected the popularity of an RSO.  The court explained:

> [t]hat does not mean that the University can never consider the number of
> students involved because some variable expenses will legitimately

---

[11]First, the court considered in detail the limitations placed on the student senators focusing on the requisite objective standards, explanation of decisions, documentation and a review process.  It approved of the allocation standards for events and operation grants under the process before it but not travel grants as there were no criteria listed to guide allocation.  Southworth, 307 F.3d at 592.

depend on this factor, such as the amount of money needed for refresh-
ments or programs distributed to attendees. Or, as illustrated above, the
number of students interested in an event may necessitate the renting of
a larger space, and in this circumstance it is legitimate to consider the
size of the attending audience.

Southworth II, 307 F.3d at 595.

### c. SUNY Albany's advisory referendum

Unlike the factors in Southworth II, no inference is required to conclude that SUNY

Albany's referendum reflects the popularity of an RSO.  The advisory referendum directly

reflects the majority view of the value of the RSO on the ballot.  There is simply no way to

use that information in consideration of funding allocation.  It does not reveal how many

students will attend an event so as to plan for rental space.  It does not reflect the number of

students involved in the group in order to justify any particular expense.  Numerous people

may vote for the RSO's funding because they support its message, yet never attend a single

event or use its services.

Furthermore, while it is difficult to discern what possible objective, non-viewpoint

based information may be inferred from a referendum vote, the dangers are obvious.  The

elected decision makers have been informed as to student public opinion of a group.  Such

polling would never be tolerated if conducted, simply for advisory purposes, by a city official

for use while determining who should be allowed to conduct a parade or protest

demonstration.

The fact that the referendum is used to consider the amount of funding as opposed

to whether to fund or defund a group does not save it.  That is akin to allowing citizens to

express their views on how long a particular group's parade should be, or how many leaflets

a particular group should be allowed to distribute.  As majoritarian views are not to be

considered in determining entrance into a public forum, neither can they be used for considering the scope of a participants' activity therein.

Defendants argue that the referendum may be saved by its advisory, as opposed to binding, nature in that Section 5.17.5 of the SA bylaws lists criteria for use in determining "whether or not to use an advisory referendum to help establish a funding level for an RSO." The information gleaned from the referendum is balanced against other factors. This argument is initially rejected because of the obvious gap in logic. The whole point of viewpoint-neutral criteria is to insulate applicants from majoritarian views. Using a majoritarian viewpoint-based factor is nonsensical.

Moreover, without undue analysis, at least two of the six factors listed in the bylaws for use in balancing this information are problematic. Bylaw § 5.17.5 requires consideration of whether the RSO will enrich campus life and whether the organization can provide services that compliment the educational mission of the university. Yet, these factors are not objective criteria themselves, and are inevitably based on the viewpoints of the individual decision makers. The use of the terms "enrich" and "compliment" in articulating viewpoint-neutral criteria demonstrates a lack of understanding of the requirements of viewpoint neutrality.

It is determined that SUNY Albany's student referendum is a content-based criterion that cannot be saved by its advisory nature or the fact that it is only used to set the amount of funding as opposed to the question of funding or defunding altogether.

Of course, content-based regulations are not necessarily prohibited by the First Amendment, but they are subject to a strict scrutiny analysis. See Kamasinski v. Judicial

- 25 -

Review Council, 44 F.3d 106, 108 (2d Cir. 1994) (citing Boos v. Barry, 485 U.S. 312, 321

(1988)); Perry v. McDonald, 280 F.3d 159, 171 (2d Cir. 2001).

> Under the strict-scrutiny test, a content-based restriction may be upheld if
> the restriction serves a compelling governmental interest, is necessary to
> serve the asserted [compelling] interest, is precisely tailored to serve that
> interest, and is the least restrictive means readily available for that
> purpose.

Hobbs v. County of Westchester, 397 F.3d 133, 149 (2d Cir. 2005), cert. denied, Civ. Act.

No. 04-498, 2005 U.S. LEXIS 5560 (2005) (citations and quotations omitted).  Moreover, the

Supreme Court noted in Rosenburger that content discrimination may be permissible in the

context of student activity fee funds if it preserves the purposes of that limited forum.

Rosenberger, 515 U.S. at 830.

Defendants have not attempted to demonstrate that the use of referenda serves a

compelling state interest.  Both defendants argued that the referendum is a tool for gauging

student interest in a RSO's services.  At oral argument, the SA admitted that the referendum

is simply an indicator - a polling device - that the SA could do without.  (Tr. Oral Argument,

James T. Foley Courthouse, Albany, New York, July 22, 2005, Tr at 15.)  SA's counsel

admitted that it really serves no purpose in a viewpoint-neutral decision making process.  Id.

at 15-16.  In the closest thing to an argument that the referenda serves the purposes of the

limited forum,  NYPIRG commented that the referendum is a good tool because it gives

groups the opportunity to demonstrate that "there's support on campus for [the group's]

services.  It's a great way for minority and new groups to come in and prove the fact that they

may be entitled to more funding than looking solely at objective criteria."  Id. at 24.

Defendants hint that there is a democratic interest involved in allowing students to

determine how their fees are allocated.  The comments do not demonstrate state interests,

- 26 -

but only clarify the conflict in the free speech context that prompted the passage of the First

Amendment in the first instance.

> The very purpose of a Bill of Rights was to withdraw certain subjects from
> the vicissitudes of political controversy, to place them beyond the reach of
> majorities and officials and to establish them as legal principles to be
> applied by the courts. One's right to life, liberty, and property, to free
> speech, a free press, freedom of worship and assembly, and other
> fundamental rights may not be submitted to vote; they depend on the
> outcome of no elections.

West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 638 (1943).

The use of advisory referenda in making allocation determinations will be deemed

unconstitutional as it is an unjustified content-based criterion used in a process that requires

viewpoint neutrality.

### D. Remaining Claims

Plaintiffs will be granted summary judgement and relief under the First cause of

action regarding the constitutionality of the use of the referendum.  Thereafter, in the Fifth

cause of action, plaintiffs bring an as-applied challenge to the SA policy and procedures

which provides access to the referendum.  Plaintiffs object to the lack of specific viewpoint-

neutral criteria for gaining access to the referendum ballot.  It is true that the SA lacked, and

still lacks, proper viewpoint-neutral criteria for making decisions regarding access to the

referendum.  The unwritten criteria alleged are insufficient, the bylaws are problematic, and

the reasons stated as to why CALL-NY was denied access appear to be post hoc

rationalizations.  See Southworth, 307 F.3d at 577 ("Without . . . guides post hoc

rationalizations by the licensing official and the use of shifting or illegitimate criteria are far

too easy, making it difficult for courts to determine in any particular case whether the licensor

is permitting favorable, and suppressing unfavorable, expression.").

However, considering that the use of a referendum to guide allocation of student activity fees has been deemed unconstitutional, it is not necessary to consider the plaintiff's as-applied challenge.  The referendum is an invalid consideration in the allocation process, even if access to it is granted through a constitutionally proper process.  <u>Forsyth</u>, 505 U.S. at 129 ("It is well established that in the area of freedom of expression an overbroad regulation may be subjected to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable.").  It is emphasized, however, that the instant ruling is confined to the issue of the use of advisory referendum, and does not address the remaining criteria the SA used or uses to make allocation determinations, some of which appear valid, others suspect.  <u>Transp. Alternatives, Inc. v. City of New York</u>, 340 F.3d 72, 79 (2d Cir. 2003).

Plaintiffs' other Free Speech and Equal Protection claims in the <u>Second</u> and <u>Third</u> causes of action are based on allegations that NYPIRG was granted unequal access to the referendum under the First and Fourteenth Amendments.  (Compl. ¶¶ 57, 59.)  Those narrowly-tailored claims are dismissed for the same reason.  Plaintiffs have obtained the relief sought.  Injunctive relief will be granted to prohibit the use of referenda in funding allocations, and the student fees plaintiffs paid on account of NYPIRG will be refunded. Because no additional relief is sought under the <u>Second</u>, <u>Third</u> and <u>Fifth</u> causes of action, it is unnecessary to make a determination as to the proper procedures for obtaining access to an improper procedure.  Those causes of action will be dismissed.

The remaining, <u>Fourth</u> cause of action alleges that defendants' quadrennial funding of NYPIRG violates the Equal Protection Clause of the Fourteenth Amendment.  The

complaint states that only NYPIRG has the "privilege of being granted funding quadrennially while other RSOs including CALL-NY are required to seek funding annually." (Compl. ¶ 61.)

> [U]nder the Equal Protection Clause . . . government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard.

Police Dep't of Chicago v. Mosley, 408 U.S. 92, 96 (1972).

In this case, it is not disputed that the SA treats NYPIRG differently than it does other RSOs.[12] Thus, "[a]s in all equal protection cases . . . the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment." Id. at 95. Plaintiff has not demonstrated that the SA made an impermissible distinction between NYPIRG and other RSOs. NYPIRG clearly provides a substantial number of services to SUNY Albany students. Indeed, the amount of funding for each RSO may well vary significantly under viewpoint-neutral criteria.

Defendants seek dismissal of this claim by setting forth facts which highlight the differences between NYPIRG and CALL-NY. That is not sufficient in the context of this case. Here, the Equal Protection claim is closely intertwined with First Amendment interests. The initial question is not whether the organizations are similarly situated, or whether the distinction is justified by government interests, but that there are viewpoint-neutral standards for determining how to fund RSOs. Defendants have not demonstrated that they made the distinction based on viewpoint-neutral criteria.

---

[12] Except for Dippikill, Inc. See supra note 3 and accompanying text..

- 29 -

Neither party has presented sufficient evidence to warrant a granting of summary judgment.  The motion papers focus almost entirely on the discretion the SA Senate exercises in relation to the referendum, thus there is simply nothing in the record to illustrate what decision making process was employed to determine whether to contract with any particular RSO for funding, quadrennially or otherwise.  It shall not be presumed that the SA uses the same criteria for making its decision to contract with NYPIRG for funding as it did when making referendum-related decisions.  It shall also not be presumed that the SA used proper viewpoint-neutral criteria.

In other words, the initial issue for analysis of this Equal Protection claim in the First Amendment context has not been properly addressed and briefed by the parties.  Indeed, plaintiff has requested discovery on the Equal Protection issue in consideration of NYPIRG's late entry into the case.  (Docket No. 39, Pls.' Mem. in Opp. Defs.' Mot. Summ.  J. at 9, n 7.)  Since all parties moved for summary judgment the request for further discovery is denied.  Under the circumstances, a dismissal of this claim without prejudice is appropriate.  The plaintiffs may or may not wish to file a new action considering the implications and results of this decision.

## IV. CONCLUSION

The use of advisory referenda in the allocation student activity fees is unconstitutional.  The advisory referendum is an unjustified content-based criterion used in a decision making process that requires viewpoint neutrality.  It is not necessary to address plaintiffs' claims attacking the procedures for gaining access to the unconstitutional referendum.  No additional relief is sought beyond that gained under the first ruling.

The Equal Protection claim will be dismissed without prejudice as neither party has addressed the claim in a manner which provides for its resolution.

Therefore, it is

ORDERED that

1.  Plaintiffs' motion for summary judgment as to the <u>First</u> cause of action is GRANTED;

2. Plaintiffs' motion for summary judgment as to the <u>Second</u>, <u>Third</u>, <u>Fourth</u>, and <u>Fifth</u> causes of action is DENIED;

3. Defendants' cross-motions for summary judgment are DENIED;

4.  The SUNY Albany student government's constitution and bylaws which provide for, and guide the use of, an advisory referendum in allocating funds collected through mandatory student activity fees, are declared invalid and stricken to the extent that they address the issue;

5.  Defendants are permanently enjoined from using an advisory referendum in allocating funds collected through mandatory student activity fees;

6.  Defendant Student Association at State University of New York at Albany is directed to return to plaintiffs, Eric Amidon and Winston Brownlow, the student activity fee money collected pursuant to the operation of the referendum, $5 per semester for each semester since their enrollment;

7.  The <u>Second</u>, <u>Third</u>, and <u>Fifth</u> causes of action are dismissed; and

8.  The <u>Fourth</u> cause of action is dismissed without prejudice.

The Clerk is directed to file  judgment accordingly.

IT IS SO ORDERED.

_____
United States District Judge

Dated:   November 7, 2005
         Utica, New York